UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANGELINA RUTH BUSTAMONTE,<br><br>Defendant. | Case No. 1:19-cr-00172-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendant Angelina Ruth Bustamonte's Motion to Suppress. Dkt. 25. The Court held oral argument on December 11, 2020, and took the Motion under advisement.[1] Upon review, and for the reasons set forth below, the Court DENIES Bustamonte's Motion.

## II. BACKGROUND

Throughout 2018, a Drug Enforcement Agency ("DEA") Task Force was investigating a woman dealing large amounts of methamphetamine in the Treasure Valley. The woman was known as "Cookie." Law enforcement officers identified her location in early 2019, and confirmed she was working with a large drug trafficking organization. It was further discovered that the organization she worked with/for might have been using storage units to store drugs.

---

[1] Because of the duration of the hearing, the Court requested that the parties present their closing arguments via written briefs. The parties timely submitted these briefs (Dkts. 51, 52) for the Court's consideration.

MEMORANDUM DECISION AND ORDER - 1

Detective James Roberson, a member of the DEA Task Force, followed Cookie on April 12, 2019, and saw her meet with another woman. This other woman was Defendant Angelina Bustamonte. Bustamonte was driving a white truck that day. The two women met at a storage unit, and Detective Roberson observed the two go in and out of the unit numerous times and place items into the truck. When the white truck left the storage unit, Detective Roberson radioed a nearby police patrol car, driven by Deputy Jeremy Seibert, summarized the situation, and asked him to initiate a traffic stop on the white truck.

Deputy Seibert located the white truck and ran the license plate through the police database. In doing so, Deputy Seibert learned the truck's registration had been canceled. He pulled behind the truck, and immediately thereafter, the truck pulled into a gas station. Deputy Seibert then initiated a traffic stop of the driver of the white truck—Bustamonte.

Bustamonte provided Deputy Seibert her driver's license and the truck's registration, but she did not have proof of insurance. Bustamonte said she had just come from her storage unit nearby and was moving personal items. In reviewing the information provided by Bustamonte, Deputy Seibert learned that the truck was registered to Gary Harmon, an individual he knew was involved in drug activity. While interacting with Bustamonte, Deputy Seibert claims she was fidgety and seemed nervous, that her speech was sometimes rapid, and that she had a hard time staying on track with what she was doing. Bustamonte disagrees with this allegation, claiming instead that the video taken from Deputy Seibert's body camera shows that her demeanor during the interaction was calm and respectful, that she spoke normally and articulately answered Deputy Seibert's questions, and that she generally did as she was asked.

After this initial interaction, Deputy Seibert returned to his patrol car and began verifying Bustamonte's information. In so doing, he learned that Bustamonte had a recent conviction for driving without insurance and that she had a drug history. While Deputy Seibert was in his patrol car, he observed Bustamonte in the driver's side mirror and through the back window. He alleges she appeared to get more nervous and act more suspicious as time went on and that she began taking multiple bags and items from the passenger seat near her and placed them into the back-passenger seat area. He also noticed her drinking water excessively. At that point, he issued a misdemeanor citation for the insurance offense and an infraction citation for the canceled registration. He began working on the citations at approximately 14:18:30. Dkt. 25-1, at 11-12.

Based upon his observations at the scene and the information he previously received from Detective Roberson, Deputy Seibert called a canine officer, Corporal Steve Bonas, to assist him at the stop. Deputy Seibert continued to fill out the citations until Corporal Bonas arrived approximately three minutes after Deputy Seibert began to write the citations. *Id.* Deputy Seibert then briefed Corporal Bonas about the situation for approximately one minute and fifteen seconds. During this time, Deputy Seibert observed Bustamonte roll up her windows. This heightened the officers' suspicions, as both knew from their training and experience that those attempting to hide drugs from a drug dog sometimes rolled up windows and closed doors to keep the smell inside the vehicle. At 14:26:00, Deputy Seibert set the first citation, number 530884 for driving without insurance, on his dashboard. *Id.*

At 14:27:00, while working on the second citation, approximately eight minutes after starting the citations, Deputy Seibert called Detective Roberson and told him he had

stopped the white pickup truck and that the driver was Angela Bustamonte. Detective Roberson knew her name as someone associated with drug activity. During the call, Deputy Seibert continued to fill out the citations.

Bustamonte then got out of her truck and attempted to question Officer Bonas about the drug dog. Officer Bonas told Bustamonte to stand in front of Deputy Seibert's patrol vehicle. Bustamonte approached Deputy Seibert's patrol car and asked him why they were doing a dog sniff. Deputy Seibert told her to stand in front of his vehicle. He then got out of the car with the citation form and spoke with Bustamonte. Bustamonte voiced concerns that the drug dog was jumping up on her truck.

While Deputy Seibert was completing the second citation, Officer Bonas stated that his dog had alerted on Bustamonte's vehicle. Deputy Seibert searched the vehicle and found drugs in a brown leather bag. At that point, Deputy Seibert informed Bustamonte she was under arrest for possessing drug paraphernalia with the intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), and placed her in handcuffs. Officer Bonas requested a female officer to respond to the scene in order to search Bustamonte incident to arrest. Such a search occurred, and the searching officer ultimately found drugs on Bustamonte. Bustamonte was arrested and later charged. Dkt. 1.

Bustamonte moved to suppress the drugs seized from the truck and from her person contending the officers violated her Fourth Amendment rights by (1) deviating from the original purpose of the traffic stop; (2) delaying in issuing the traffic citations; and (3) calling for a drug detection dog to conduct a drug investigation without reasonable

suspicion. Dkt. 25. Bustamonte further argues that her Fourth Amendment rights were violated when the officers searched her truck without probable cause. *Id.*

### III. LEGAL STANDARD

The Fourth Amendment guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Mapp v. Ohio*, 367 U.S. 643, 646 n.4 (1961) (quoting U.S. Const. amend. IV). Generally, searches and seizures conducted without a warrant are "*per se* unreasonable under the Fourth Amendment" subject to "a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (cleaned up).

An exception to the warrant requirement that is pertinent to this case is a seizure for a traffic violation. *Rodriquez v. United States,* 575 U.S. 348, 354 (2015). Such a seizure is only justified if the officer diligently pursues the purpose of the stop; any deviations or delays for unrelated investigations violate the driver's Fourth Amendment right, unless the reason for the delay is supported by independent reasonable suspicion. *Id*. at 354-55.

Additionally, the automobile exception to the warrant requirement permits police to search a vehicle when the car is "readily mobile" and "probable cause exists to believe it contains contraband." *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (cleaned up). The police may search both an automobile and the containers within it "where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991).

If no exceptions to the exclusionary rule applies, any subsequently found evidence must be suppressed. Evidence that the government obtains in violation of the Fourth

Amendment, as well as the fruit of that evidence, is generally excluded from the prosecution of the alleged violator. *Wong Sun v. United States,* 371 U.S. 471, 484-85 (1963). Further, evidence discovered through "exploitation of" an illegal search or seizure, must also be suppressed as "fruit of the poisonous tree." *Id*. at 488.

## IV. ANALYSIS

Bustamonte argues that Deputy Seibert improperly deviated from the purpose of the traffic stop—which was to investigate and cite Bustamonte for her canceled registration and failure to provide proof of insurance—when he decided to pursue an independent drug investigation. In particular, she argues that Deputy Seibert delayed issuing the citations in order to allow time for the dog sniff. She further argues that Deputy Seibert neither had reasonable suspicion to justify the deviation from the purpose of the traffic stop nor justification for the dog sniff. In light of these suggested shortcomings, Bustamonte concludes that all resulting evidence against her must be suppressed. The Court will address each issue below.

**A. The Delay**

   *a. Unreasonable Delay*

The threshold issue in this case is whether Deputy Seibert delayed Bustamonte's traffic stop by acting outside of the purpose of the stop's mission. If the Court finds there was such a delay, it must determine if the delay was justified by a reasonable suspicion of drug activity.

Broadly speaking, the tolerable duration of police inquiries in a traffic stop context is determined by the seizure's "mission." *Rodriguez*, 575 U.S. at 354. Beyond determining

whether to issue a traffic ticket, an officer's "mission" during a traffic stop typically includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. *Id.* at 355.

A dog sniff is not "an ordinary incident of a traffic-stop." *Id*. at 355-56. Accordingly, inquiries or actions (such as a dog sniff) that measurably extend the duration of the stop and that are outside of the purpose of the stop's mission must be justified by reasonable suspicion independent of the traffic investigation. *Arizona v. Johnson*, 555 U.S 323, 333 (2009). Finally, the facts forming reasonable suspicion must be based upon "objective observation," and the inferences law enforcement draws from those facts must be "objectively reasonable." *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1123 (9th Cir. 2002).

In sum, there must be reasonable suspicion to prolong the duration of any seizure; otherwise, law enforcement's actions must not unreasonably prolong the duration of the seizure.[2] As it relates to a dog sniff, the act must either not delay the traffic stop at all, or if it does, there must be a reasonable suspicion of criminal activity for the delay to be justified.

Bustamonte argues Deputy Seibert unreasonably delayed the traffic stop in this case when he: (1) talked with Officer Bonas when Officer Bonas arrived on scene to conduct a

---

[2] It goes without saying that *some* incremental delays are per se reasonable simply due to the nature of police work. As the United States Supreme Court has noted, "traffic stops are especially fraught with danger to police officers." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (cleaned up).

MEMORANDUM DECISION AND ORDER - 7

dog sniff; (2) called Detective Roberson, the detective included in the drug investigation of the unnamed woman; (3) watched Bustamonte roll up her windows and close the door of the truck behind her after Officer Bonas asked her to get out of the truck so that he could run his drug-detection dog (Endy) around it; and (4) instructed Bustamonte where to stand, answered the questions that Officer Bonas told her to direct to Deputy Seibert, and got out of this patrol car to keep an eye on Bustamonte and Officer Bonas during the sniff. The Court will address each of these arguments in turn.

First, when Officer Bonas talked with Deputy Seibert as he arrived on scene to conduct a dog sniff, Bustamonte argues he delayed the traffic stop by 1.25 minutes or more. Neither party argues that this may have caused some delay, and to the minimal extent that it did, the Court disagrees it rises to the *Rodriguez* standard of "unreasonably prolonged" or the standard of "measurably extend" as shown in *Arizona v. Johnson.* Bringing a fellow officer up to speed regarding an ongoing traffic stop for a de minimis amount of time can hardly be called an unreasonable delay.

Second, when Deputy Seibert called Detective Roberson—the detective involved in the drug investigation of the unnamed woman—he allegedly delayed the traffic stop by an unknown amount of time. At this point, however, Deputy Seibert had reasonable suspicion of drug related activity and the traffic stop was quickly becoming a drug investigation. Although the extent was again, very minimal, to the degree that Deputy Seibert delayed the stop, it does not rise to the level of "unreasonably prolong[ed]" or "measurably

extend[ed]."³

Third, when Deputy Seibert watched Bustamonte roll up her windows and close her door after Officer Bonas asked her to get out of the truck so that he could run Endy around it, he allegedly delayed the traffic stop by 45 seconds. The Court disagrees. As part of Deputy Seibert's duties, he must maintain situational awareness to maintain his safety and the safety of others. This delay, if it was a delay at all, was minimal and justified. In fact, if this was a delay, it was caused by Bustamonte and her conduct. Deputy Seibert had to watch what she was doing to make sure it would not cause a threat to officer safety.

Fourth, when Deputy Seibert instructed Bustamonte where to stand, answered the questions that Officer Bonas told her to direct to him, and got out of his patrol car to keep an eye on her and Officer Bonas during the sniff, he allegedly delayed the traffic stop by one minute or more. Again, this likely caused no delay—as defined by the aforementioned caselaw—but even if it had, the delay was very minimal and not unreasonable.

In conclusion, the Court finds that none of Bustamonte's proffered reasons amount to a delay. Each "delay" was de minimus, justified, or not truly a delay at all.

The Court next addresses other arguments raised by Bustamonte. Citing *Rodriguez,* Bustamonte argues that "a stop is considered unreasonably prolonged whenever an unrelated inquiry adds time to the stop, even if it is '*de minimis*' or incremental." Dkt. 25, at 11. This assertion is not exactly accurate. In *Rodriguez*, the defendant moved to suppress evidence seized during a traffic stop on the grounds that the officer had prolonged the stop

---

³ The Court would also note that Deputy Seibert's body camera footage shows that he continued to work on the traffic citations *while* talking "hands-free" to Detective Roberson.

without reasonable suspicion in order to conduct a dog sniff. 575 U.S. at 352. A federal magistrate judge recommended that the motion be denied. *Id.* The magistrate judge reasoned that while the officer did not have reasonable suspicion to delay the stop, seven to eight minutes was a de minimis intrusion on Rodriguez's rights and permissible. *Id.* at 353. The district court agreed and concluded that "dog sniffs that occur within a short time following the completion of a traffic stop are not constitutionally prohibited if they constitute only de minimis intrusions." *Id.* The Eighth Circuit agreed, concluding in turn that the intrusion was de minimis and permissible. *Id.* In light of this conclusion, however, the Eighth Circuit *did not* address the issue of reasonable suspicion. *Id.* The United States Supreme Court granted certiorari in the case specifically to resolve the question of whether a law enforcement officer can "extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." *Id.* The Court ultimately held that law enforcement *may not* extend an otherwise-completed traffic stop *absent reasonable suspicion* in order to conduct a dog sniff. *Id.* at 357–58. Because the Eighth Circuit had not analyzed whether there was reasonable suspicion, the Supreme Court remanded the case for further proceedings. *Id.* at 358.

  Here, Bustamonte's proposition is missing a key phrase from *Rodriguez*: "absent reasonable suspicion." Thus, Bustamonte's assertion that "a stop is considered unreasonably prolonged whenever an unrelated inquiry adds time to the stop, even if it is '*de minimis*' or incremental" should be prefaced with the critical clause "absent reasonable suspicion." The Court will address this issue further in the following section. Suffice it to say at this point, the Court finds Bustamonte's argument regarding de minimis delay

misplaced.

Second, Bustamonte argues Deputy Seibert should have written one citation, instead of two, and this shows he "consciously drew out" writing the citations and delayed the traffic stop. The Court disagrees. Writing a citation for an infraction and another one for a misdemeanor in one traffic stop in fact requires filling out two separate citation forms. This is due to the organization of the form inquiring whether the citation is an infraction "or" a misdemeanor. *See* Idaho infraction Rule 5(d); Idaho Misdemeanor Criminal Rule 5(g).

Of course, it can always be argued that a person *could* have worked faster. However, upon review, it appears that Deputy Seibert conducted his business in an organized and timely fashion without delay. Even assuming there was some unnecessary time spent on ancillary tasks, the delay was negligible at most. Bustamonte argues that the delays "which totaled over three minutes" rose to such a degree that they "unreasonably prolong[ed]" the traffic stop in the aggregate. The Court disagrees. In continuance of the Court's analysis, to the minimal extent that Deputy Seibert delayed the stop, the delay was justified with reasonable suspicion. The Court turns to this topic next.

  b. *Reasonable Suspicion*

Even were the Court to determine Deputy Seibert prolonged the duration of the traffic stop, if supplemented with a reasonable suspicion of criminal activity, the delay is justified. *Rodriguez*, 575 U.S. at 358. The Court, therefore, next considers whether Deputy Seibert had reasonable suspicion to delay the traffic stop.

It is undisputed that the original purpose of the traffic stop was to investigate

Bustamonte's canceled registration.[4] What *is* disputed is whether at some point during the traffic stop, Deputy Seibert developed a reasonable suspicion that Bustamonte was in possession of drugs and whether he could thus extend the stop to investigate those suspicions.

Initially, it stands out to the Court that Bustamonte had been in contact with a woman being investigated by a DEA Task Force for dealing large amounts of methamphetamine just prior to Deputy Seibert's stopping her. The DEA Task Force also knew that the drug group the woman was associated with might have been using storage units in Treasure Valley to store drugs. Critically, Deputy Seibert knew this information going into the traffic stop.

Now, even assuming Deputy Seibert did not have any knowledge of the ongoing drug investigation, such knowledge is imputed to him. The Government only references the "collective knowledge doctrine" in passing (Dkt. 31, at 9; Dkt. 51, at 4); however, it applies in this case. Under the collective knowledge doctrine, the Court must determine whether an investigatory search complied with the Fourth Amendment by looking to the "collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually [undertakes the challenged action]." *United*

---

[4] Bustamonte asserts that the traffic stop was "exploratory," and that officer only stopped her to find out who was driving the white truck. Dkt. 52, at 7. This misconstrues the facts. While it is plausible that Officers wanted to know who was driving the truck, Bustamonte was stopped for an *actual* violation of the law—canceled registration. Even then, pretextual stops are not illegal. *See United States v. Wallace*, 213 F.3d 1216, 1219 (9th Cir. 2000), *as amended* (July 7, 2000) (explaining, "[t]he fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances justify the stop."). Here, whether pretextual or not, the stop was justified.

MEMORANDUM DECISION AND ORDER - 12

*States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (citing *United States v. Sutton,* 794 F.2d 1415, 1426 (9th Cir.1986)). When an officer with direct knowledge of facts that give rise to a reasonable suspicion orders another officer, not involved in the investigation, to conduct a traffic stop, search, or arrest, the collective knowledge doctrine is satisfied. *Ramirez*, 473 F.3d at 1031 (explaining the collective knowledge doctrine has no requirement regarding content, but only that the officer with personal knowledge of facts giving rise to a reasonable suspicion communicate an appropriate order to another officer to conduct a stop, search, or arrest).

Here, the collective knowledge doctrine applies because Detective Roberson, an officer in possession of facts giving rise to a reasonable suspicion of criminal activity, asked another officer to conduct a traffic stop. Moreover, while not required under *Ramirez*, Detective Roberson actually provided Deputy Seibert with that specific information.

Again, however, even were the Court to completely ignore all the information Deputy Seibert obtained from Detective Roberson, the Court still concludes that he had reasonable suspicion to delay the traffic stop and undertake a drug investigation.

Indeed, during the traffic stop, Deputy Seibert learned that the truck Bustamonte was driving was registered to someone that Deputy Seibert recognized as having been involved in drug activity in the past. Deputy Seibert also observed that Bustamonte seemed "overly nervous," "spoke rapidly," "was very fidgety," and "appeared to have a hard time staying on track with what she was doing." Dkt. 50, at 104–05. Further, while writing citations, Deputy Seibert observed Bustamonte moving items from the front passenger seat

MEMORANDUM DECISION AND ORDER - 13

into the back seat, digging around in the center console, drinking from her water bottle "excessively", and looking at him through her side mirror. *Id.* at 113.

Bustamonte claims that none of these purported observations give rise to a reasonable suspicion of drug activity. That very well might be, if the events took place in isolation.[5] But the Court must consider the totality of circumstances. Thus, while any singular fact in this case might not rise to the level necessary to extend the traffic stop and support a search, when viewed in the aggregate, the reasonableness of Deputy Seibert's suspicions is adequately supported by the record in this case.

Bustamonte relies on *United States v. Hernandez-Alvarado*, 891 F.3d 1414 (9th Cir. 1989), to supplement her argument that Deputy Seibert lacked sufficient reasonable suspicion in this case. She points out that in that case, the Ninth Circuit found that six separate facts that officers deemed suspicious were not sufficient to form reasonable suspicion to stop the vehicle. However, citation of this case is unpersuasive as *Hernandez-Alvarado* turned on whether the Officer had reasonable suspicion to *stop* the vehicle in the first instance. Here, Deputy Seibert had a valid reason to stop Bustamonte: her canceled registration. Moreover, the suspicious facts in this case are distinguishable both in kind and number from the ones in *Hernandez-Alvarado*: the facts here are more suspicious than the

---

[5] Bustamonte points out in her moving papers that reasonable suspicion is more than a mere hunch or inference and must be some articulable suspicion. Bustamonte then goes on to list roughly ten facts the government relies on and argues why each could not support Deputy Seibert's reasonable suspicion that she was engaged in drug activity. Dkt. 25-1, at 15-16 & n.8. To some degree, this argument undermines itself. As already noted, when viewed in isolation, any one of these factors might not be sufficient to establish reasonable suspicion of drug activity. But taken together, Bustamonte's argument is difficult to accept because Bustamonte has to essentially write-off ten key facts in order to support her position. The sheer number of arguably suspicious acts speak for themselves.

ones there and there are *more* suspicious facts here than there were there.

Although the Court agrees that the Fourth Amendment does not permit officers to prolong a traffic stop in order to establish reasonable suspicion, here, the Court finds that Deputy Seibert *had* reasonable suspicion and *could* prolong the traffic stop to investigate his suspicions. Law enforcement was investigating (and surveilling) a woman who was known to be involved with illegal drugs. Bustamonte met with that woman and was seen moving items into her vehicle from a storage unit—a location law enforcement recognized as often being used to store drugs. This information alone constitutes reasonable suspicion of drug activity and under the collective knowledge doctrine, Officers could have stopped Bustamonte to investigate. That said, Deputy Seibert had a second, independent reason to stop Bustamonte: the truck's canceled registration. While performing those duties, Deputy Seibert observed Bustamonte exhibit not one, or even merely a few, but many irregular and suspicious behaviors. Those behaviors—coupled with his prior knowledge of the ongoing drug investigation—provided him with a reasonable suspicion of drug activity. A drug investigation was, therefore, appropriate.

In sum, the Court concludes that Deputy Seibert did in fact have reasonable suspicion that Bustamonte was engaged in illegal activities. Thus, any delay in the traffic stop was justified. The Court will next address the search.

**B. The Search**

Bustamonte next argues that her Fourth Amendment rights were violated when the Officers searched the truck because Endy's alert was unreliable and did not provide probable cause for the search.

MEMORANDUM DECISION AND ORDER - 15

When police conduct a warrantless search of a vehicle following an "alert" by a drug-detection dog, the government bears the burden of showing that the dog's alert was reliable. *Florida v. Harris*, 568 U.S. 237 (2013). In *Harris*, the Supreme Court held that a reviewing court can presume the reliability of a drug dog if "a bona fide organization has certified [the] dog after testing his reliability in a controlled setting . . . ." *Id*. at 246-47. And even if the dog has not been certified, the court may deem an alert reliable if the dog "has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *Id*. at 247. The test for probable cause is viewed through the lens of common sense, whether "all the facts surrounding a dog's alert, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id*. at 248.

Bustamonte argues the Government cannot show that Endy gave a reliable alert, in part, based upon a perceived lack of training. Bustamonte highlights some inconsistencies in training documents (dates, hours, etc.)—and testimony regarding those documents—but does not actually contest that Endy was certified. Accuracy in record keeping is critical, especially in law enforcement. However, the issues Bustamonte points out are not "egregious errors," but appear little more than clerical errors. It is clear Endy is certified. It is also clear he has the appropriate training. Therefore, the Court finds Bustamonte's argument unpersuasive.

Bustamonte's final argument is less attenuated than its certification argument, but is no more persuasive. Bustamonte argues that Endy's behavior was insufficient to establish probable cause that a controlled substance was present in her vehicle. Bustamonte

highlights certain perceived inconsistencies with Endy's behavior such as the belief that Endy's handler, Officer Bonas, "cued" Endy to alert on the truck or that some of his behaviors were more "dog-like" than investigatory. Bustamonte enlisted the testimony of an expert witness to support these propositions.

The Court has weighed the relevant testimony and finds no evidence to support Bustamonte's arguments. First, there is nothing to indicate that Officer Bonas "cued" Endy. The process of performing a dog sniff is fluid. The officer naturally has to indicate where he or she wants the dog to sniff. He or she also must communicate with the dog and provide necessary feedback. The Court has reviewed the available video and testimony and finds Officer Bonas's actions were all appropriate.

Second, there is nothing to suggest Endy's alert in itself was unreliable. Officer Bonas testified that there was nothing unusual about Endy's alert in this situation. He testified that the alert Endy gave that day was consistent with Endy's alert in prior trainings as well as in the field. This testimony aside, Bustamonte posits that some of the behaviors Endy exhibited were "natural" dog behaviors and not indicative of finding contraband. Nobody, including Officer Bonas, denies the fact that Endy, like all drug-detection dogs, exhibits dog-like behaviors that are not specific to drug detection. That said, the Court finds Officer Bonas's interpretation of Endy's behavior more credible based on the testimonies given and the fact that the expert is unaffiliated and has never worked with Endy before. Moreover, Bustamonte contends that it is "the Court [and] not the handler" who must determine whether Endy's alert was reliable. Thus, Bustamonte seems to suggest that her expert's opinion should have more weight that Officer Bonas's opinion when it comes to

formulating the Court's opinion. To be sure, it is the Court's duty to determine whether probable cause exists, but in order to decide that question, the Court must naturally take into account Officer Bonas's opinion. Here, there is no reason to doubt his testimony. Furthermore, while Bustamonte's expert opinion is appreciated, it was more academic in nature and did not aid the Court in its analysis and evaluation of Endy's specific behaviors in this case.

In sum, the Court finds that Endy's alert was reliable and that "all the facts surrounding [the] dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248.

## V. CONCLUSION

Upon review, the Court concludes that the Officers had two independent bases for the traffic stop in this case. First, the truck Bustamonte was driving had a canceled registration. Second, they had reasonable suspicion of drug activity.

Viewing these two bases in isolation, the Court determines that Deputy Seibert did not improperly delay the original traffic stop. He accurately performed his duties and what de minimis delay came as a result of those actions did not infringe on Bustamonte's rights. Furthermore, even if it could be said that there was some delay, such was justified by the second basis for the stop: the drug investigation. The collective knowledge doctrine applies in this case. Detective Roberson provided Deputy Seibert with knowledge of an ongoing drug investigation. This alone was sufficient to support a finding of probable cause for the dog sniff. On top of that, Deputy Seibert learned that the vehicle Bustamonte was driving

was registered to a known drug user, and he also observed various behaviors that, based upon his training and experience, led him to believe that Bustamonte was engaged in criminal activity. For all of these reasons, the Court concludes that Deputy Seibert had reasonable suspicion that Bustamonte was engaged in criminal activity and that a dog sniff would confirm his suspicions. In short, the delay (if any) and the dog-sniff were justified.

Finally, the Court finds that Endy's alert on Bustamonte's truck was valid and reliable. Accordingly, the subsequent search was justified under the Fourth Amendment. The Court will not suppress the fruits of that search.

## VI. ORDER

IT IS HEREBY ORDERED:

1. Bustamonte's Motion to Suppress (Dkt. 25) is DENIED.

DATED: March 8, 2021

David C. Nye
Chief U.S. District Court Judge